AO 106 (Rev. 04/10) Application for a Search Warrant

**FILED**
**U.S. District Court**
**District of Kansas**
10/16/2026
**Clerk, U.S. District Court**
**By: AS Deputy Clerk**

# UNITED STATES DISTRICT COURT

for the

District of Kansas

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
A Samsung SM-F966U (Galaxy Z Fold7) cell phone seized from Darrell White at the time of his arrest, currently located at the Kansas Internet Crimes Against Children (ICAC) offices, 1211 S Emporia, Wichita, Kansas

Case No. 26-M-6253-01-GEB

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
A Samsung SM-F966U (Galaxy Z Fold7) cell phone seized from Darrell White at the time of his arrest, currently located at the Kansas Internet Crimes Against Children (ICAC) offices, 1211 S Emporia, Wichita, Kansas

located in the ______________ District of Kansas, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 2252A(a)(2) and 2252A(a)(5)(B) | Distribution/receipt of child pornography; Possession of child pornography |

The application is based on these facts:

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: ____________ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[signature], TFO
*Applicant's signature*

Natalie Daeman, TFO, FBI
*Printed name and title*

Sworn to before me and in my presence.

Date: 16 Oct 2026 @ 1:45pm

[signature]
*Judge's signature*

City and state: Wichita, Kansas

Honorable Gwynne E. Birzer, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Natalie Daemen, being duly sworn, hereby deposes and states the following:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Detective with the Wichita Police Department, and have been with the department since March 2011. I am currently a Task Force Officer for the Federal Bureau of Investigations. As a Task Force Officer of the FBI, I am authorized to investigate violations of laws of the United States, and I am a law enforcement officer with authority to execute arrest and search warrants under the authority of the United States, including violations of Title 18, United States Code § 1591, 2251, 2252 and 2252A. I have participated in a wide variety of criminal investigations, to include violent crime, crimes against children, major theft, and other federal crimes. I have participated in the preparation and execution of many search warrants, including, but not limited to, those involving sex trafficking and the sexual exploitation of minors.

2. The information in this affidavit is information known to me as a result of my participation in this investigation and information that has been communicated to me by other law enforcement investigators involved in this investigation. Since this affidavit is being submitted for the limited purpose of supporting a search warrant, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth only those facts that I believe are necessary to establish the existence of probable cause to support a search warrant.

## PURPOSE OF THE AFFIDAVIT

3. This Affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant for the device seized by law enforcement from Darrell **WHITE** (hereinafter **WHITE**) during his arrest which occurred during a traffic stop at Kellogg & I-235, Wichita, KS **(hereinafter referred to as TARGET DEVICE)**, and more

specifically described in Attachment A of this Affidavit, on or about October 8, 2026, and currently in the possession of the Kansas Internet Crimes Against Children (ICAC) offices located at 1211 S Emporia, Wichita, Kansas, for contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2252A(a)(1) (transportation of child pornography); 2252A(a)(2)(A) (receipt or distribution of child pornography); and 18 U.S.C. § 2252A(a)(5)(B) (possession of and access with intent to view child pornography); and 18 U.S.C. § 2252A (production of child pornography); which items are more specifically described in Attachment B of this Affidavit.

4. The statements in this Affidavit are based in part on information provided by witnesses, observations of other officers and detectives, as well as my own investigation into this matter. Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that they believe are necessary to establish probable cause to believe that contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2252A(a)(1) (transportation of child pornography); 2252A(a)(2)(A) (receipt or distribution of child pornography); and 18 U.S.C. § 2252A(a)(5)(B) (possession of and access with intent to view child pornography); and 18 U.S.C. § 2252A (production of child pornography); and are located within the electronic devices described in Attachment A.

## STATUTORY AUTHORITY

5. As noted above, this investigation concerns alleged violations of 18 U.S.C. § 2252A(a)(1) (transportation of child pornography); 2252A(a)(2)(A) (receipt or distribution of child pornography); and 18 U.S.C. § 2252A(a)(5)(B) (possession of and access with intent to view child pornography); and 18 U.S.C. § 2252A (production of child pornography); relating to material involving the sexual exploitation of minors:

a. 18 U.S.C. 2251(a) prohibits any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who transports any minor in or affecting interstate commerce, with the intent that such minor engage in, any sexual explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct.

b. 18 U.S.C. § 2252A(a)(1) prohibits knowingly transporting child pornography using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer or mail.

c. 18 U.S.C. § 2252A(a)(2) prohibits knowingly receiving or distributing any child pornography that has been mailed or shipped or transported in interstate or foreign commerce by any means, including by computer.

d. 18 U.S.C. § 2252A(a)(5)(B) prohibits knowingly possessing, or accessing with intent to view, any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

6. The following definitions apply to this Affidavit and Attachment B:

a. "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

b. "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

c. "Cloud storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet.

d. "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. *See* 18 U.S.C. § 1030(e)(1).

e. "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units; internal and peripheral storage devices such as fixed disks; external hard drives; "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer; and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

f. "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

g. "Hyperlink," as used herein, refers to an item on a web page or in a mobile application which, when selected, transfers the user directly to another location in a hypertext document or to some other web page or (part of) a mobile application.

h. "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

i. An "Internet Protocol address" or "IP address," as used herein, refers to a unique numeric or alphanumeric string used by a computer or other digital device to access the Internet. Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination. ISPs typically maintain

logs of the subscribers to whom IP addresses are assigned on particular dates and times.

j. The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

k. "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

l. "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

m. "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

n. A "storage medium" is any physical object upon which computer data can be recorded. Examples include hard disks; RAM; "thumb," "jump," or "flash" drives; CD/DVDs; and other magnetic or optical media.

o. "URL" is an abbreviation for Uniform Resource Locator and is another name for a web address. URLs are made of letters, numbers, and other symbols in a standard form. People use them on computers by clicking a pre-prepared link or typing or copying and pasting one into a web browser to make the computer fetch and show some specific resource (usually a web page) from another computer (web server) on the Internet.

p. "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## BACKGROUND OF THE INVESTIGATION AND PROBABLE CAUSE

7. On or about June 25, 2026, Wichita Police Department Officers were dispatched to 655 N Chipper Ln, Wichita, Kansas, to contact a foster mother who reported that she had seized a cell phone belonging to 17-year-old Minor Victim 1 (hereinafter **MV1**) and had discovered nude videos of **MV1** which **MV1** had sent to an unknown person via the application Snapchat.[1]

8. The foster mother turned **MV1**'s Apple iPhone over to Officers when she made this report.

9. Wichita Police Officers documented the Snapchat conversation which contained the nude videos of **MV1** and saw the person **MV1** had sent the videos to was using a Snapchat account with username **wayne.80white**.

10. The individual operating the Snapchat account with username **wayne.80white** was identified by investigators as Darrell Wayne **WHITE**, Jr (hereinafter **WHITE**) during this investigation.

11. Officers saw in the Snapchat conversation that **WHITE** solicited **MV1** several times for media depicting **MV1**'s exposed genitals.

12. Wichita Police Officers contacted and interviewed **MV1** at her place of employment. **MV1** told Officers **WHITE** was a family friend that she knew as "Little Darrell",

---

[1] Snapchat is an American multimedia social media and instant messaging app and service developed by Snap Inc., originally Snapchat Inc. One of the principal features of the app are that pictures and messages, known as "Snaps", are typically only accessible for a brief period of time before their recipients can no longer access them. The app has evolved from originally focusing on person-to-person photo sharing to now showcasing users' "Stories" of 24 hours of chronological content, along with ""Discover", letting brands show ad-supported short-form content. It also allows users to store photos in a password-protected area called "My Eyes Only". It has also reportedly incorporated limited use of end-to-end encryption, with intention to expand its use in the future.

and **MV1** said she initially contacted **WHITE** to ask him for money to pay for transportation and food.

13. Investigators executed state of Kansas search warrants to Snapchat accounts with usernames **wayne.80white** and the account associated with MV1.

14. Investigators executed a state of Kansas search warrant on **MV1**'s Apple iPhone.

15. Investigators reviewed the extraction of **MV1**'s iPhone and observed the Snapchat conversation between **MV1** and **WHITE**. The iPhone extraction data showed that **MV1** sent five videos depicting a masturbating female to **WHITE**.

16. Three of those videos were sent to **WHITE** on June 15, 2026, and two of those videos were sent to **WHITE** on June 24, 2026.

17. The above five videos were also found in both **MV1**'s and **WHITE**'s Snapchat search warrant data.

18. Snapchat's data showed that the Snapchat account associated with MV1 and Snapchat account **wayne.80white** were connected as Friends at the time the Snapchat accounts were preserved.

19. Investigators requested subscriber information from Snapchat for **WHITE**'s Snapchat account pursuant to the state of Kansas search warrant. Snapchat responded with data showing **WHITE**'s email address associated with Snapchat account with username wayne.80white is **wayne.80.white@gmail.com**.

20. Investigators executed a state of Kansas search warrant to Google for subscriber information related to email address **wayne.80.white@gmail.com**. Google's response to that search warrant showed that the individual behind the Google account with email address

**wayne.80.white@gmail.com** listed their name as Darrell White, date of birth October 11, 1980, and phone number 316-796-6595.

21. Investigators reviewed the email content Google provided for the Google account with email address **wayne.80.white@gmail.com** and located the following emails of interest.

a. 5/13/2026: Email from Credit Union of America advising "Darrell W White" of a declined debit charge. There were multiple emails from Credit Union of America on various dates, all advising "Darrell W White" of a declined debit charge.

b. 6/29/2026: Email from Google reminding "Darrell" to finish setting up his **Samsung SM-F966U**.

i. Investigators researched a Samsung **SM-F966U** and found its marketing name is **Samsung Galaxy Z Fold7**.

c. 7/13/2026: Email from Mid-American Credit Union advising "Darrell W White" that he has not yet obtained insurance on a 2025 Kawasaki KX 65 that he financed through their institution.

d. June 5, 2026: Email from Doordash confirming an order placed to McDonald's with delivery to 3919 S Broadway Ave, Wichita, KS 67216, USA.

22. **MV1** was forensically interviewed on July 16, 2026. During that interview **MV1** confirmed that the videos she sent to **WHITE** depicted her masturbating and only showed her genitals. This description is consistent with the content of the five videos seen on **MV1**'s phone extraction.

23. **MV1** was asked by investigators how they could locate **WHITE**. **MV1** did not know where **WHITE** lived but said when she and **WHITE** were communicating, **WHITE** told her if he ever came to pick her up, he would be in his "red race car."

24. Investigators began attempts to identify **WHITE** and as part of that process, searched the Kansas Adult Supervised Population Electronic Repository (hereinafter KASPER) for last name "White", first initial "D", middle initial "W" and located **WHITE** in KASPER with a date of birth of October 11, 1980. Investigators saw **WHITE** had a 2004 conviction for Attempted Aggravated Criminal Sodomy; Sodomy with a child less than 14 years of age.

25. Investigators then searched the Kansas Bureau of Investigations Registered Offender Database for Darrell **WHITE** with date of birth October 11, 1980. Investigators located WHITE in this database and reviewed **WHITE**'s registered vehicles, finding **WHITE** had three red Ford Mustangs registered to him in the offender registration database.

26. The facts from the investigation were presented to the Wichita Grand Jury on October 6, 2026. The Wichita Grand Jury returned true bills on each count of receipt of child pornography presented to them on that date. An arrest warrant was issued for **WHITE** on October 8, 2026.

27. Wichita Police Officers contacted **WHITE** during a traffic stop in the evening of October 8, 2026. **WHITE** was arrested and transported to Wichita Police Department Investigations.

28. **WHITE** was in possession of a **Samsung Galaxy Z Fold** phone when he was arrested.

29. While completing a Personal History sheet with investigators, **WHITE** described one of his recently driven vehicles, a 1983 Ford Mustang, as a "race car" and said he worked at Cruiser's Auto Sales located at 3919 S. Broadway. This is the same address from a Doordash order email found in the Google search warrant return from the email associated with the Snapchat account.

30. Investigators conducted a post-Miranda interview with **WHITE**. During that interview, **WHITE** said his email address was **wayne.80.white@gmail.com**, his phone number was 316-796-6595.

31. **WHITE** said nobody besides him knew his Gmail password or his phone passcode.

32. **WHITE** said nobody besides him used his phone.

33. **WHITE** denied having a Snapchat account.

34. **WHITE** said he has only had his **Samsung Galaxy Z Fold** phone for approximately one month. WHITE said his previous phone was an Apple iPhone.

35. **WHITE** said he knew **MV1**'s sister but denied knowing **MV1**.

36. Investigators told **WHITE** this case centered on him having nude videos of **MV1**, a 17-year-old child. **WHITE** said **MV1** told him she was 18 years old, then claimed he did not know **MV1**.

37. **WHITE**'s Samsung Galaxy Z Fold was secured at the Kansas ICAC offices located at 1211 S Emporia, Wichita, Kansas.

38. Investigators contacted **WHITE**'s girlfriend Kayleigh Stokesberry on October 9, 2026. Stokesberry told investigators that **WHITE** has possessed his **Samsung Galaxy Z Fold** phone for approximately one year, having obtained the phone after switching to Verizon for phone service.

39. Stokesberry told investigators that **WHITE**'s previous phone, an Apple iPhone, no longer functioned at the time **WHITE** obtained the **Samsung Galaxy Z Fold**.

## BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET

40. Based on my experience in the investigation of computer-related crimes and the discussions I have had with other investigators who have experience in investigations related to child exploitation, I know the following:

a. Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

b. Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via wireless connections such as "WiFi" or "Bluetooth." Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone, or transferred to external storage devices, such as a USBC. These memory cards and USBC devices are often large enough to store thousands of high-resolution photographs or videos.

c. A modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections. Electronic contact can be made to literally millions of computers around the world. Child pornography can therefore be easily, inexpensively and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

d. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. Electronic storage media of various types - to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on the computer - can store thousands of images or videos at very high resolution. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. Some media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person.

e. The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f. Your Affiant knows from training, experience, and consultation with certified digital forensic examiners that evidence of crimes involving the solicitation, receipt, and possession of Child Sexual Abuse Material (CSAM) is highly volatile and easily manipulated. Suspects targeting older adolescents frequently utilize mainstream, peer-to-peer, or end-to-end encrypted messaging applications (such as Signal, WhatsApp, Snapchat, or Instagram). These platforms often feature specialized privacy controls, including disappearing or self-destructing messages, view-once media, and hidden or locked chat folders.

f. Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide email services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone, or external media in most cases.

g. A growing phenomenon related to smartphones and other mobile computing devices is the use of mobile applications, also referred to as "apps." Apps consist of software downloaded onto mobile devices that enable users to perform a variety of tasks – such as engaging in online chat, sharing digital files, reading a book, or playing a game – on a mobile device. Individuals commonly use such apps to receive, store, distribute, and advertise child pornography, to interact directly with other like-minded offenders or with potential minor victims, and to access cloud-storage services where child pornography may be stored.

h. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (*i.e.*, by saving an email as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files) or unintentional. Digital information, such as the traces of the path of an electronic communication, may also be automatically stored in many places (*e.g.*, temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

i. I know from training, experience and communications with other investigators that not all data stored on digital devices (computers, mobile devices, removable storage media, etc.) has date and time stamps associated with it. After the digital data has been extracted from a device, whether it be "imaging" the physical memory or collecting the full or partial file system into an archive file (commonly referred to as a "ZIP file"), the extracted data is then parsed using forensic software tools. The software tools decode and extrapolate data from files and folders. Files and folders

tracked by the file system that the storage media was formatted with will usually have date and time stamps; however, some data is parsed from within a file and is presented as a "file" in the forensic software (thumbnails, cache images, etc.). These "files" most likely will not have a date and time associated with them. Furthermore, mobile devices store a great deal of information, including files, in databases. The information in the databases is decoded and presented as individual items in the forensic software. If an entry in a database has a date and time, it will be presented; if it does not have that information, then none will be presented with the item. With all of this in mind, when a forensic examiner filters for a specific date and time range, much information relevant to or connected with the crime being investigated can be missed.

41. Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who produce and access online child sexual abuse and exploitation material:

a. Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b. Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. Such individuals almost always possess and maintain child pornographic material in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain those materials and child erotica for many years.

d. Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, or in cloud-based online storage, to enable the individual to view the child pornography images, which are valued highly. Some of these individuals also have been found to

download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

e. Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[2]

f. Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain contact information (e.g. online messaging accounts, email addresses, etc.) of individuals with whom they have been in contact and who share the same interests in child pornography.

g. Such individuals prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

h. In my training and experience conducting child exploitation investigations, I am aware that persons who receive, possess, and distribute images of child pornography sometimes utilize email accounts and online "cloud" storage to correspond with other persons sharing similar interests; and that those persons sometimes utilize those email accounts and online "cloud" storage to receive, transmit and store images of child pornography. Cloud-based storage can be utilized by child pornography distributors/possessors to add a layer of anonymity to their actions, as well as attempt to conceal the trading and collecting of child exploitation material from law enforcement.

42. I submit that there is probable cause to believe those records referenced above will be stored on that electronic device or storage medium, for at least the following reasons:

a. Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

[2] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, e.g., *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370-71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010)).

b. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

43. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the item listed in Attachment A because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish

and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, Internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, computers typically contain information that logs: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the Internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., Internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore,

contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

44. Based upon my training and experience, and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage. I know that during searches, it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a. Searching computer systems is a highly technical process that requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software, or operating system that is being searched;

b. Searching computer systems requires the use of precise, scientific procedures, which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer

hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

45. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

46. I submit that this affidavit supports probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits, and instrumentalities of these offenses, more fully described in **Attachment B**, are located

in or at the location described in **Attachment A**. I respectfully request that this Court issue a search warrant for the location described in **Attachment A**, authorizing the seizure and search of the items described in **Attachment B**.

Respectfully submitted,

Natalie Daemen, TFO
Natalie Daemen, Task Force Officer
Federal Bureau of Investigation

Sworn to and subscribed before me on this 16th day of October, 2026

Gwynne E. Birzer
HONORABLE GWYNNE E. BIRZER
United States Magistrate Judge

## ATTACHMENT A

### DEVICE TO BE SEARCHED

The following device seized during the arrest of Darrell White at Kellogg and I-235, Wichita, Kansas, currently at the Kansas Internet Crimes Against Children Task Force Offices located at 1211 S Emporia, Wichita, Kansas. The device is further described below:

**1. Samsung SM-F966U (Galaxy Z Fold7)**





## ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEIZED

All records on the **TARGET DEVICE** described in Attachment A that relate to violations of 18 U.S.C. § 2252A(a)(1) (transportation of child pornography); 2252A(a)(2)(A) (receipt or distribution of child pornography); and 18 U.S.C. § 2252A(a)(5)(B) (possession of and access with intent to view child pornography); and 18 U.S.C. § 2252A (production of child pornography), or attempts to do so, concerning the sexual exploitation of minors. This authorization includes the search of electronic data to include deleted data, remnant data and slack space. The seizure and search of computers and computer media will be conducted in accordance with the procedures set forth in the affidavit submitted in support of this warrant. Items to be seized include the following:

1. Any and all child pornography (as defined in 18 U.S.C. § 2256(8)), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

2. Any and all child erotica, including documents, writings, and images or videos of children that do not qualify as child pornography but evince a sexual interest in children.

3. Any and all documents, records, or correspondence, in any format or medium, pertaining to operation of the **Snapchat** accounts described in the attached affidavit.

4. Any and all software, applications, computer related documentation, and passwords, that may be or are used to:

   a. produce, distribute, receive, possess or access child pornography or visual depictions of minors engaged in sexually explicit conduct;

   b. seek, obtain, store, or record information pertaining to the sexual exploitation of children or otherwise relate to an interest in child pornography, visual depictions of

minors engaged in sexually explicit conduct, child erotica, or the sexual exploitation of children; and

c. communicate with any other person regarding child pornography, visual depictions of minors engaged in sexually explicit conduct, child erotica, or the sexual exploitation of children.

5. Any and all data or information on the device, which may reveal indicia of ownership, access, or use of the account and websites described in the attached affidavit.

6. Any and all notes, documents, records and correspondence pertaining to child pornography, visual depictions of minors engaged in sexually explicit conduct, child erotica, or the sexual exploitation of children, and to include any and all data or records that may reveal indicia of creation, use, or ownership of the notes, documents, records, or correspondence.

7. Any and all computer software, including programs to run operating systems, applications, utilities, compilers, interpreters, and communications programs, including, but not limited to, P2P or other software or applications that may be, or are used to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica.

8. Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, e-mail messages, chat logs, google searches and electronic messages) pertaining to the offenses listed above.

9. Any and all diaries, address books, names, and lists of names and addresses of individuals who may have been contacted by the operator of the **TARGET DEVICE** for the purpose of engaging in the offenses listed above.

10. Any and all records or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages), identifying persons transmitting, through interstate or foreign commerce by any means, including, but not limited to, by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

11. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, other digital data files and web cache information) concerning the offenses listed above.

12. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about exploiting children or child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in exploiting children or child pornography.

13. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that exploit children or provide or make accessible child pornography to members.

14. Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an Internet Service Provider.

15. Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

16. Any and all visual depictions of minors.

17. Evidence of any interaction with, photos of, or evidence of the above referenced crimes involving MV1 and any other minors.

18. Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means, including by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

19. Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

20. Evidence of user attribution showing who used or owned the device at the time the crimes listed in this warrant were committed, including:

a. records of Internet Protocol addresses used;

b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

21. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

22. All bank records, checks, credit card bills, account information, and other financial records concerning the offenses listed above.

23. Any information recording **WHITE's** schedule or travel or movement concerning the offenses listed above to the present.